UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH LEONARD,

Petitioner,

v.

PATRICK EATON,

Respondent.

No.  2:19-cv-0230-TLN-SCR

FINDINGS & RECOMMENDATIONS

Petitioner is a state prisoner representing himself in this habeas corpus action filed pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2015 conviction from the Sacramento County Superior Court for murder and attempted murder following an altercation in a McDonald's parking lot.  Upon careful consideration of the record and the applicable law, the undersigned recommends denying petitioner's habeas corpus application on the merits.

I.    **Factual and Procedural History**

A.  **Trial Court Proceedings**

Following a jury trial, petitioner was convicted of first degree murder and premeditated attempted murder.  ECF No. 10-1 (Abstract of Judgment).  The jury also found true enhancements for personal use of a deadly weapon (i.e., a motor vehicle) and hate crime allegations based on the victims' ethnicity.  ECF No. 50-7 at 118, 121 (Verdict Forms).  On January 9, 2015, petitioner was sentenced to an indeterminate state prison term totaling forty years to life.  ECF No. 10-1.

After independently reviewing the record, this court finds the state appellate court's summary of the evidence accurate and adopts it herein.[1]

*Prosecution's case-in-chief*

1.    *The killing*

On the morning of June 6, 2013, [petitioner] and Samantha Silva arrived at McDonald's in [petitioner]'s truck for coffee.[2] [Footnote omitted.] After a while, Silva walked outside of the restaurant and noticed two men. One had on a backpack; the other had a bicycle. The men offered her food to eat and asked if she was hungry. She said she was not and continued to the truck.

The two men, Toussaint Harrison and Justin Oliphant, were giving away food they had taken from a motel to homeless people at the McDonald's parking lot. Harrison was on a bike. They asked Silva for money and cigarettes, and offered her some food. She declined their requests and offers.

When [petitioner] returned to the truck, Silva, who is mentally disabled, told [petitioner] that Oliphant and Harrison were bothering her. This angered [petitioner], and he told them to leave Silva alone. The three men argued and cursed at each other with racial epithets and insults.

[Petitioner] walked back to his truck and retrieved a long chain. He swung it at Oliphant and Harrison. The three men fought, as [petitioner] tried to hit the other two with the chain. One of the men punched [petitioner]. Oliphant pulled out a pocket knife but it fell on the ground. Harrison threw something sharp at [petitioner], possibly a broken bottle or a pocket knife, and it cut his cheek. During the fight, [petitioner] called the two men various racial slurs and derogatory epithets. The altercation lasted about one minute, after which [petitioner] walked back to his truck and Oliphant and Harrison walked toward the McDonald's entrance. [Footnote omitted.]

[Petitioner] backed his truck to the McDonald's entrance where Oliphant and Harrison were standing. He got out of the truck and chased the two men around the parking lot while swinging the chain. After a minute or so, he walked back to the McDonald's entrance and stomped on Harrison's bike. He briefly picked it up, but he dropped it when Oliphant ran toward his truck and threatened to smash the windows. Harrison grabbed his bike, and he and Oliphant walked away and out of the parking lot. [Petitioner], still holding the chain, went inside McDonald's and gave an employee a pocket knife. He

---

[1]  See 28 U.S.C. § 2254(e)(1) (emphasizing that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts it by clear and convincing evidence).

[2]  The court has replaced "defendant" with "petitioner" to reflect the procedural posture of this habeas corpus proceeding.  The changes are indicated in brackets.

1    returned to his truck and left the parking lot.

2    After they left McDonald's, Oliphant and Harrison went through a
      parking lot towards an IHOP restaurant. Oliphant walked and
3    Harrison rode his bike. [Petitioner] drove his truck into the parking
      lot and sped towards them. Oliphant heard a loud "revving" engine
4    and saw [petitioner]'s truck about 20 feet away coming toward them
      at a high rate of speed. The truck came at Oliphant. He dove out of
5    the way and landed on the parking lot. The truck hit a sign for a car
      wash.
6
      [Petitioner] reversed the truck, turned around, and headed towards
7    Harrison. Oliphant yelled at Harrison to move. [Petitioner] hit
      Harrison full-force with the front of the truck. Harrison flew into the
8    air and into the truck's windshield, rolled off the truck, and landed
      on the ground. After striking Harrison, [petitioner] stopped, reversed
9    the truck, turned around, and started chasing Oliphant. He tried to hit
      him two additional times, but Oliphant dodged and jumped out of the
10   way to avoid being hit. Oliphant fled the scene on foot.

11   Frank Folger, an employee at Clutch Mart, heard a squealing sound
      of tires and a thud. Another Clutch Mart employee, Dan Gandy, also
12   heard the noise. He went outside and saw Harrison lying on the
      ground, bleeding. He yelled at Folger to call 911. Folger called as he
13   walked outside holding a cordless phone. A Black male who
      identified himself as a relative of the injured man picked up
14   Harrison's bicycle and left.

15   After Oliphant escaped, [petitioner] turned his truck around and
      drove back towards Harrison, who was still lying on the ground.
16   Seeing this, Gandy ran and placed himself between the motionless
      Harrison and [petitioner]'s truck. [Petitioner] kept driving towards
17   Gandy, but when he got within 10 feet of Gandy, he swerved away
      and stopped. He got out of his truck, approached Harrison, and
18   kicked him in the head and torso numerous times with his steel-toed
      boots. He yelled racial and derogatory slurs while he kicked
19   Harrison.

20   Folger walked up and yelled at [petitioner] to stay away from
      Harrison. Gandy ran into his store and retrieved a large pry bar. He
21   came back holding the bar and told [petitioner] to get away from
      Harrison. When [petitioner] backed away, Gandy took the keys out
22   of the truck's ignition and told [petitioner] to sit on the tailgate until
      police arrived. [Petitioner] told Gandy when this was all done, he
23   knew where Gandy worked and they would settle it.

24   Harrison died from blunt force injuries to the head. He also suffered
      blunt force injuries to his torso, a dislocated and fractured right
25   clavicle, five broken lumbar vertebrae, and blunt force injuries to his
      arms and legs. His injuries were consistent with being struck by a
26   motor vehicle. The pathologist believed more of Harrison's injuries
      were caused by being hit by the truck than by being kicked or
27   stomped. Harrison's blood tested positive for amphetamine and
      methamphetamine, but negative for alcohol and other illicit
28   substances.

1

2.    *[Petitioner]'s arrest*

2

Deputies detained [petitioner] at the scene. Asked how the altercation
continued so far away from McDonald's, [petitioner] said the
altercation just continued that way. He also said, "If that fucker dies,
oh well, he tried to kill me."

3

4

[Petitioner] said a number of things over the next two hours while he
was detained and recorded in a patrol car. He said, "I was fearin' for
my life. You see what they did to me, man." He continued, "[T]hey
chased me, then . . . I beat 'em off me, and then next thing I know,
you know, I'm over here—we're over here. I don't know. It just
happened so fast. . . . Maybe I'm wrong. I'm—I'm wrong for, you
know, my actions. I doubt if I'm gonna squeak outta this very easily,
sir. I mean, it was pretty bad. If those punks wanted bad they got
bad."

5

6

7

8

9

[Petitioner] said, "I became the aggressor I realize this you know.
But they were aggressive but then they started running 'cause I
started getting crazy." "Just because we got Obama for a president
these people think they are real special. And I am not prejudice."
(Sic.)

10

11

12

He also said, "I don't think I am going to walk on this one. Honestly.
You and I both know if they did that to you—you have all the right
to do whatever you want to do. That don't make me an exception. I
realize this. But I am not going to take it from these [people] or
anybody. You know I am a law abiding citizen turning over a new
leaf and look what happens. I really feel bad about that. I really do. I
don't think none of it was right."

13

14

15

16

[Petitioner]'s blood contained no presence of alcohol or illicit
substances.

17

18

3.    *Crime scene investigation*

19

Law enforcement personnel observed [petitioner]'s truck had a crack
in the grill, a dent in the hood, and the windshield was shattered. They
found hair fibers in the windshield. They also found a white bucket
in the truck bed that contained a rusted metal chain.

20

21

A backpack located at the scene contained a smoking pipe and
multiple pieces of broken glass.

22

23

A vehicle collision expert testified that, based on photos and witness
interviews, 21-foot tire friction marks found at the scene were caused
by acceleration, not braking.

24

25

A criminalist determined paint transfer found on the car wash sign at
the scene was similar to paint from the fender of [petitioner]'s truck.
He also concluded paint transfer found on the truck's bumper was
similar to paint from the car wash sign.

26

27

28

4

*Defense*

Jon Lee, the manager of the car wash in the parking lot where the killing occurred, arrived at work around 9:00 a.m. the day of the killing. He did not notice any new damage to the car wash sign. The sign "was always kind of damaged."

[Petitioner] testified on his own behalf. He said when he first walked up to Oliphant and Harrison in the McDonald's parking lot, he thought they were hungry, so he offered them some change. One said no, but the other said, "Give me your money." After [petitioner] walked back to the truck, one of them said, "Fuck you, you white bitch ho." Petitioner walked back to them and told them they had no right to talk to Silva like that. He said they were scaring her and he asked them to leave her alone. They said in an aggressive manner, "What are you gonna do, man? Do you want to die? You don't know who you're fucking with. We'll kill you."

Petitioner backed off and told Silva to call 911. He did not have a cell phone, but neither did she. He walked toward the McDonald's entrance to report the men, and he told Oliphant and Harrison what he was doing. They immediately started coming at him. [Petitioner] swung at them to back off. Oliphant swung at him with a knife. Harrison threw something and hit [petitioner]'s face, cutting his left cheek. Oliphant threw his knife, and it hit [petitioner] in the stomach and bounced off. [Petitioner] picked up the knife and put it in his pocket.

[Petitioner] backed off, but he wondered what they would do to the next person. So he got into his truck and backed up to the McDonald's entrance to report them. [Petitioner] got out of the truck, and Oliphant yelled at him. [Petitioner] grabbed a chain from the bed of his truck to protect himself. He wrapped the chain around his hand and walked toward the restaurant entrance.

Oliphant threatened to break the windows in [petitioner]'s truck. [Petitioner] proceeded toward the two, swinging the metal chain to protect his truck. The two backed up, but came at him again once he turned around to go. [Petitioner] grabbed Harrison's bicycle to keep them there as long as possible, hoping that somebody would help or the police would arrive.

[Petitioner] heard someone say, "Get the girl." Oliphant ran toward the truck, [petitioner] ran toward Oliphant, and Harrison ran toward [petitioner] to get his bike. Harrison retrieved the bike, and then [petitioner] heard someone say, "Pop him with the gun," and then, "Yeah, man." As soon as he heard this, [petitioner] went into McDonald's. He gave the knife to an employee and said, "These people assaulted me. Here's the evidence. Please call 911. I need help." Then he said he was "going to stop them," and he left the restaurant.

He observed Oliphant and Harrison had left, so he got in his truck. His intent at that point was to go home. He was upset and mad. He drove out of the McDonald's parking lot. As he drove down the

street, however, he saw the two men "fleeing" in a driveway entrance to a parking lot. They were headed away from him. He thought, "[T]hey started it. They attacked me. They assaulted me. They threatened the girl. And they had a gun. They needed to be stopped." By "stopped," he meant, "Apprehended for the police."

He pulled into the driveway to stop them. He accelerated to catch up to them. Harrison was farther away, and it looked to [petitioner] that Harrison would leave and go onto a sidewalk. [Petitioner] intended to pull his truck in front of the area where Harrison was going. He approached Oliphant and veered to the left away from him. Harrison was going left, so [petitioner] went to the right. He was trying to stop them from leaving. He was not trying to hit them.

But then Harrison turned right in front of [petitioner], and [petitioner] hit him. He did not accelerate because he "was already rolling." [Petitioner] put on the brakes as soon as Harrison turned into him. Next, he accelerated backwards and followed Oliphant to block him from leaving, but Oliphant escaped.

[Petitioner] parked the truck and got out to see if Harrison was okay. By then, Gandy was there, but he suddenly left. [Petitioner] saw Harrison laying on the ground and a pistol lying under him. He rolled Harrison over with his foot and kicked the gun away toward Harrison's backpack.

A minute or two later, a man approached Harrison and picked up the gun that was lying there. He went through Harrison's backpack, then got on the bike. The man said Harrison was his "cuz." He rode a few circles around [petitioner], threatened him, and then rode away.

Gandy waved a pry bar at [petitioner] and Folgers came out, and the two stared at him. He put down his tailgate and sat on it.

On cross-examination, [petitioner] admitted he never told law enforcement there was a threat of a gun being used against him. His statement to that effect in trial was the first time he mentioned one of the men had a gun. He later stated he told a deputy at the scene something to the effect they had a gun, but both he and the deputy were talking and he did not believe the deputy heard him.

Also on cross-examination, [petitioner] disputed Gandy's and Folger's testimony that they stood between his truck and Harrison to stop him from hitting Harrison again, and that he kicked Harrison and called him a racial slur.

*Rebuttal*

Detective John Kauo detailed the inconsistencies between [petitioner]'s testimony and the statement [petitioner] gave to Detective Kauo the day of the crime. Detective Kauo said [petitioner] in his earlier statement did not mention he offered the men money, that the men threatened to damage his truck, that one of them said, "Get the girl," that one of them said, "Pop him with a gun," or even anything about a gun. [Petitioner] did not claim he accidentally hit

6

Harrison. Rather, he stated he was not going to let the men get away with what they did to him. [Petitioner] told Detective Kauo he ended up at Clutch Mart because "they started runnin' and [he] wasn't gonna let them get away from what they did and the way they were acting."

Deputy Gene Goff testified [petitioner] told him at the scene he asked Oliphant and Harrison at McDonald's to leave Silva alone because she already had a boyfriend. [Petitioner] said an argument ensued, and the men pulled out knives and tried to slash him. [Petitioner] did not tell Deputy Goff he offered the men change. He did not acknowledge he punched the men or swung a chain at them. He said nothing about a gun near the victim, that one of the men threatened to pop him with a gun or get Silva, or that he used his foot to roll over Harrison in order to kick the gun out from under his body. [Petitioner] also did not say he accidentally hit Harrison with his truck. He told Deputy Goff, "If that fucker dies, oh well, he tried to kill me."

ECF No. 10-2.

## B. Direct Appeal Proceedings

Petitioner appealed the judgment. The California Court of Appeal affirmed his conviction on February 9, 2018 and the California Supreme Court denied review on May 9, 2018. ECF Nos. 10-2, 10-4.

## C. State and Federal Habeas Proceedings

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on June 12, 2019. ECF No. 32-1. The court denied the petition without comment on November 26, 2019. ECF No. 32-2.

Petitioner filed the operative second amended federal petition on January 15, 2020. ECF No. 30. In claim one, he alleges that his right to a fair trial was violated when the trial court reopened closing argument rather than answer the jury's question about intent. In claim two, Petitioner alleges that the trial court denied him due process by failing to instruct the jury on imperfect defense of another. In claim three, petitioner contends that counsel was ineffective in violation of the Sixth Amendment for failing to request jury instructions negating premeditation and including provocation by the victim. Next petitioner raises a sufficiency challenge to the evidence of premeditation supporting his murder and attempted murder conviction. In claim five, petitioner asserts that his conviction was secured in violation of the physical facts due to the

7

1    inherently unbelievable testimony of the victim.  Petitioner next contends that there is sufficient

2    record evidence to reduce his murder conviction to manslaughter.  Claim seven challenges the

3    effectiveness of petitioner's trial and appellate counsel for various reasons.  However, the court

4    previously dismissed subclaims (f)-(j) of claim seven as unexhausted.  See ECF No. 51.  Next,

5    petitioner alleges that at the time of the offense he was suffering from severe post-traumatic stress

6    disorder ("PTSD").  Finally, petitioner contends that his Miranda rights were violated.

7            Respondent asserts that, as a preliminary matter, petitioner's submission of new evidence

8    in support of his habeas claims as well as his request for an evidentiary hearing, are barred by

9    Cullen v. Pinholster, 563 U.S. 170 (2011), and its progeny.[3]  ECF No. 49 at 16-17.  With respect

10   to claim one, respondents submits that there is no Supreme Court decision that has ever "directly

11   addressed whether the reopening of argument, after the jury begins deliberations, violates

12   constitutional mandates."  ECF No. 49 at 20 (citing Magana-Torres v. Harrington, No. 2:10-cv-

13   2669-WBS-TJB, 2011 U.S. Dist. LEXIS 146140 at *27 (E.D. Cal. Dec. 19, 2011)).  Absent such

14   authority, petitioner is not entitled to habeas relief for claim one.  Properly construing claim two

15   as a challenge to the trial court's denial of a lesser included offense instruction based on imperfect

16   defense of others, petitioner is not entitled to relief once again due to a lack of Supreme Court

17   precedent.  ECF No. 49 at 23-24.  "[T]he Supreme Court has never clearly held, outside of the

18   death penalty context, that a state criminal defendant is constitutionally entitled to have his jury

19   instructed on lesser included offenses."  ECF No. 49 at 23 (citation omitted).  Addressing claims

20   four, five, and six as a cumulative challenge to the sufficiency of the evidence supporting

21   premeditation, respondent counters that petitioner's claims do not view the evidence in the light

22   most favorable to the prosecution, as is required by Jackson v. Virginia, 443 U.S. 307, 319

23   (1979).  Id. at 37.  Moreover, "[p]etitioner does not explain how any inconsistency undermined

24   eyewitness accounts of the crimes, video footage, [p]etitioner's admissions or the remaining

25   physical evidence."  Id.  Regarding claim eight, respondent asserts that "a fairminded jurist could

26

27   [3]  Moreover, respondent does not concede that petitioner has properly exhausted his claims for
     relief to the extent that his additional factual allegations change or enhance the claims presented
28   to the state court.  See ECF No. 49 at 17.

8

1   conclude, [p]etitioner points to no record evidence indicating [his] lack of competence [based on

2   his medication for PTSD].” Id. at 38.  To the contrary, “from the time he was arrested until the

3   time he took the stand to testify, [p]etitioner… exhibited the ability to communicate, both to

4   officers, and to the courtroom from the stand, in an effort to explain why he was guilty of

5   something less than the charged crimes.” Id.  Finally, based on the Miranda claim alleged in

6   ground nine, respondent submits that a “fairminded jurist could conclude that a spontaneous or

7   voluntary statement from a suspect in custody is admissible even in the absence of Miranda

8   warnings.” Id. at 39.

9        Respondent further counters each claim that petitioner’s trial and appellate counsel were

10  ineffective.  Specifically, in claim three, respondent contends that the state court’s rejection of his

11  ineffective assistance of counsel claim was not objectively unreasonable because “it would be

12  clear to reasonable counsel that Petitioner actually received all the instruction on provocation that

13  was necessary for the jury to find reduced culpability.  Provocation and state of mind were

14  adequately explained by the several instructions….” Id. at 28.  Additionally, “the state court

15  reasonably found, because the jury received instruction and argument on provocation, Petitioner

16  also could not show a redundant pinpoint instruction would have changed the outcome.” Id.  The

17  IAC claim for failing to present a PTSD defense does not afford relief in this case because “a

18  fairminded jurist could conclude that Petitioner did not present sufficient evidence that a mental

19  health expert would have diagnosed Petitioner with PTSD, or that such an expert would have

20  testified in a way that was both admissible and helpful to the defense.  Petitioner does not present

21  any such proposed testimony.” Id. at 30 (citations omitted).  Counsel’s failure to challenge

22  alleged perjury by witness Silva does not entitle petitioner to relief because it was reasonable to

23  “refrain from characterizing Silva’s testimony as perjury” based on mere inconsistencies. Id. at

24  33.  Trial and appellate counsels’ failure to challenge petitioner’s recorded statements before

25  receiving Miranda warnings did not constitute deficient performance since the statements were

26  not made in response to any police questioning. Id. at 34-35.

27       In his traverse, petitioner focuses on the events that occurred in the McDonald’s parking

28  lot to demonstrate that the jury should have convicted him of manslaughter instead of

premeditated murder.  ECF No. 56.  Petitioner indicates that the order of the facts presented by respondent is misleading because it suggests that petitioner was the first person to use a dangerous weapon during the initial confrontation in the McDonald's parking lot.  ECF No. 56 at 13-14.  Regarding claim one, petitioner submits that the trial court's decision to reopen argument rather than answer the jury's question amounts to structural error that requires reversing his conviction.  ECF No. 56 at 16.  Even relying on the Jackson standard for sufficiency of the evidence challenges, petitioner asserts that "there was no proof of [p]etitioner's intent to kill anyone of the victims in this case by way of premeditation."  Id. at 23.  Petitioner further contends that he was denied the effective assistance of counsel at trial because there was no tactical reason for failing to request a jury instruction on provocation.  Id. at 20-21.  Regarding claim seven, petitioner reiterates that his trial and appellate counsel failed to discover or present evidence regarding his PTSD and the medication he was taking for it both prior to and during trial.  Id. at 28.  "Petitioner contends that this court should find that due to the fact that [p]etitioner served in the military and now suffers from [PTSD,] a known mental illness[,] requires reversal of this case to enable [p]etitioner to… gain adequate mental health care [as] opposed to penal incarceration."  Id. at 32.  Additionally, petitioner submits that he is entitled to relief based on the cumulative errors of his attorneys' ineffectiveness.  Id. at 31.

## II.    New Claims Raised in Traverse

Also attached to petitioner's traverse are numerous exhibits.  One of the attachments is the California State Bar Court's Stipulation of Disbarment for petitioner's trial counsel dated May 11, 2018.  ECF No. 56 at 51-65.  This disbarment order is based on trial counsel's misappropriation of three separate client's funds between 2014 and 2017.  Id.  Petitioner also submits a declaration and bank records indicating that trial counsel misappropriated $45,000 of his veterans' benefits.  ECF No. 56 at 45-49.  Other exhibits include a letter petitioner sent to his trial counsel dated February 24, 2018 requesting the contact information for a witness named Kenneth.  ECF No. 56 at 49-50.  According to petitioner, this witness would have been able to testify that petitioner was in imminent danger while at the McDonald's parking lot.  Id.  Finally, petitioner attached portions of his medical records from the Veterans Administration including a May 12, 2011 psychological

1    test that diagnosed petitioner with schizophrenia and not PTSD.  ECF No. 56 at 101-107.

2           Based on these exhibits, it appears to the court that petitioner raises new claims for relief

3    in his traverse.  These new claims include: 1) a challenge to the use of his prior convictions at

4    sentencing; 2) a <u>Batson</u> challenge to the prosecution's use of peremptory challenges to strike

5    African Americans from the jury;  3) ineffective assistance of trial counsel for: a) failing to

6    investigate and present testimony from witness Kenneth; b) misappropriating petitioner's money;

7    c) failing to object to the prosecutor's fast forwarding of the videotape at trial which concealed

8    witnesses from the jury; d) failing to object to the prosecution's use of just a portion of

9    petitioner's police interrogation to conceal the <u>Miranda</u> violation; and, e) failing to investigate

10   and interview the McDonald's manager to obtain mitigating evidence.  These claims will be

11   addressed in the court's subsequent analysis.

12           **III.      AEDPA Standard of Review**

13           To be entitled to federal habeas corpus relief, petitioner must affirmatively establish that

14   the state court decision resolving the claim on the merits "was contrary to, or involved an

15   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

16   of the United States."  28 U.S.C. § 2254(d)(1).  The "contrary to" and "unreasonable application"

17   clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

18                  A federal habeas court may issue the writ under the "contrary to"
                    clause if the state court applies a rule different from the governing
19                  law set forth in our cases, or if it decides a case differently than we
                    have done on a set of materially indistinguishable facts. The court
20                  may grant relief under the "unreasonable application" clause if the
                    state court correctly identifies the governing legal principle from our
21                  decisions but unreasonably applies it to the facts of the particular
                    case. The focus of the latter inquiry is on whether the state court's
22                  application of clearly established federal law is objectively
                    unreasonable, and we stressed in <u>Williams [v. Taylor</u>, 529 U.S. 362
23                  (2000)], that an unreasonable application is different from an
                    incorrect one.
24

25   <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).

26           "A state court's determination that a claim lacks merit precludes federal habeas relief so

27   long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

28   <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652,

1   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

2   state prisoner must show that the state court's ruling on the claim being presented in federal court

3   was so lacking in justification that there was an error well understood and comprehended in

4   existing law beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

5       The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

6   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

7   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

8   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

9   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

10  may constitute "clearly established Federal law," but circuit law has persuasive value regarding

11  what law is "clearly established" and what constitutes "unreasonable application" of that law.

12  Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

13  1057 (9th Cir. 2004).

14      Relief is also available under the AEDPA where the state court predicates its adjudication

15  of a claim on an unreasonable factual determination.  28 U.S.C. § 2254(d)(2).  The statute

16  explicitly limits this inquiry to the evidence that was before the state court.  See generally Cullen,

17  563 U.S. 170.  Under § 2254(d)(2), factual findings of a state court are presumed to be correct

18  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

19  decision that was based on an unreasonable determination of the facts in light of the evidence

20  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

21  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

22  factual error must be so apparent that "fairminded jurists" examining the same record could not

23  abide by the state court factual determination.  A petitioner must show clearly and convincingly

24  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

25      If petitioner meets either of the 28 U.S.C. § 2254(d) standards, then the federal habeas

26  court reviews the merits of the constitutional claim under pre-AEDPA standards in order to be

27  entitled to relief.  Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).

28      This court looks to the last reasoned state court decision in applying the 28 U.S.C. §

1    2254(d) standard.  <u>Wilson v. Sellers</u>, 584 U.S. 122 (2018) (adopting the <u>Ylst</u> look through

2    presumption of silent state court denials of relief even after the decision in <u>Harrington</u>); <u>see also</u>

3    <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991)(establishing the "look through" doctrine in federal

4    habeas cases).  Thus, this court "looks through" any silent denial by the California Supreme Court

5    and reviews the reasoned California Court of Appeal's decision for objective reasonableness

6    under 28 U.S.C. § 2254(d).  <u>See Johnson v. Williams</u>, 568 U.S. 289, 297 n. 1 (2013).

7        **IV.    Analysis**

8            **A.  Fair Trial Violation Based on the Trial Court's Reopening of Closing
             Argument**

9

10            In claim one, petitioner contends that his rights to due process and a fair trial were

11    violated when the trial court reopened closing argument in response to a jury question about

12    intent.  <u>See</u> ECF No. 50-11 at 153 (describing the jury's note as asking, "Can the intent of an

13    action change during the process of the crime?  Do we use the lesser intent or choose what seems

14    to be the most excessive/strongest intent?"); ECF No. 50-7 at 116 (Clerk's Transcript).  While the

15    prosecutor agreed to reopen closing argument, defense counsel asked the court to refer the jury to

16    its previous instructions.  Before these additional closing arguments were given, the jury sent a

17    further note informing the trial court that, "We cannot all agree this is first degree murder.

18    Instructions say to inform you.  Please advise."  ECF No. 50-11 at 155.  Ultimately, both the

19    prosecution and defense were permitted 10 extra minutes of closing argument to address the

20    jury's question on intent.  The second closing arguments ended at 11:17 a.m. and the jury

21    returned its verdict at 2:15 p.m. on the same day.  ECF No. 50-11 at 167-168.

22            This claim was raised and rejected on direct appeal.  As a result, the last reasoned state

23    court opinion was issued by the California Court of Appeal.  The state court determined that there

24    was no fair trial or due process violation because the trial "court reasonably concluded it could

25    protect defendant's rights best by allowing both sides to argue the issue one more time instead of

26    it expounding on the instructions and risk coercing any type of verdict."  ECF No. 10-2 at 14.

27    Nor did the trial court make any comments "showing any kind of preference for a particular

28    verdict."  <u>Id</u>.

                                            13

1   Petitioner is not entitled to relief on this claim because he does not demonstrate that the

2   state court decision was contrary to, or an unreasonable application of clearly established federal

3   law. See 28 U.S.C. § 2254(d). As respondent points out, there is no Supreme Court decision that

4   has ever "directly addressed whether the reopening of argument, after the jury begins

5   deliberations, violates constitutional mandates." See Magana-Torres v. Harrington, Case No.

6   2:10-cv-2669-WBS-TJB, 2011 U.S. Dist. LEXIS 146140, at *27 (E.D. Cal. Dec. 20, 2011)). The

7   undersigned recognizes that the Ninth Circuit in United States v. Evanston, 651 F.3d 1080 (9th

8   Cir. 2011), found that a federal district court abused its discretion in permitting supplemental

9   argument on issues dividing the jury. However, the Evanston court based that decision on its

10   supervisory powers, not on constitutional principles. Id. at 1082-83, 1093 n.15; see Taylor v.

11   Sullivan, No. CV 12-3550-BRO JPR, 2013 U.S. Dist. LEXIS 119905, at *55 n.13 (C.D. Cal.

12   Aug. 22, 2013) ("Evanston relied on the court's supervisory powers rather than on any

13   constitutional provision and therefore has no relevance in § 2254(d) analysis") (citation omitted).

14   Accordingly Evanston is not persuasive authority as to what constitutes Supreme Court doctrine

15   on constitutional limits to reopened arguments. Cf. Early v. Packer, 537 U.S. 3, 9-11 (2002)

16   (holding that Ninth Circuit erred in a § 2254 case by relying on "nonconstitutional" Supreme

17   Court authority based solely on court's supervisory powers). Absent relevant Supreme Court

18   authority, the undersigned cannot conclude that petitioner is entitled to relief on claim one. Claim

19   one should be denied.

20          **B.  Due Process Violation Based on Failure to Instruct on Imperfect Defense**
              **of Another**
21

22   In claim two, petitioner challenges the trial court's failure to instruct the jury on imperfect

23   defense of another. According to petitioner, he should only have been convicted of voluntary

24   manslaughter and attempted voluntary manslaughter based on this theory of defense. In

25   substance, this is a claim that the jury should have been instructed on the lesser included

26   manslaughter offenses.

27   This claim was also raised and rejected on direct appeal. The California Court of Appeal

28   rejected this argument because even reviewing the evidence based on petitioner's own testimony,

1    there was no imminent danger of harm to another person to support giving the instruction.  ECF

2    No. 10-2 at 15-18.  "If, as he testified, the killing was an accident and he did not intend to kill

3    Harrison, then he did not actually believe he had to use deadly force immediately to defend

4    another person, and there was no basis for instructing on imperfect self defense."  ECF No. 10-2

5    at 17.  Likewise, petitioner testified that he did not intend to kill Oliphant.  Id.  "Without an intent

6    to kill, [petitioner] could not have believed he had to attempt to kill Oliphant to protect another

7    from imminent harm."  Id.

8         Jury instruction challenges are generally questions of state law.  See Estelle v. McGuire,

9    502 U.S. 62, 71-72 (1991).  In order to be entitled to federal habeas relief based on the failure to

10   give a jury instruction, petitioner must demonstrate that the defect "so infected the entire trial that

11   the resulting conviction violates due process."  Estelle, 502 U.S. at 72.  The petitioner's burden is

12   "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be

13   prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977); see

14   also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

15        In this case, the California Court of Appeal properly concluded that even petitioner's own

16   testimony did not provide sufficient evidence that the killing and attempted killing of Harrison

17   and Oliphant was done in the imperfect defense of another.  Due process only requires a lesser

18   included offense instruction in a non-capital murder case when the evidence is sufficiently

19   substantial that it must be submitted to the jury.  See Mullaney v. Wilbur, 421 U.S. 684, 697-98,

20   703-04 (1975); contrast Beck v. Alabama, 447 U.S. 625, 635-38 (1980) (holding that due process

21   requires lesser included offense charge in capital murder case).  Having reviewed the trial

22   testimony and the remainder of the jury instructions in this case, the undersigned concludes that

23   the state court rejection of this claim was neither contrary to nor an unreasonable application of

24   federal law.  Claim two should be denied.

25                          **C. Miranda Violation**

26        In claim nine, petitioner asserts that his conviction was obtained in violation of his Fifth

27   and Fourteenth Amendment rights to remain silent because he was not given Miranda warnings

28   until the afternoon of the shooting.  See ECF No. 24 at 46 (Sheriff's Department County of

1    Sacramento Miranda Advisement). The Miranda form submitted by petitioner indicates that he

2    invoked his right to remain silent at 2:10 p.m. on June 6, 2013 even though he was arrested at

3    8:00 a.m. that morning. Compare ECF No. 24 at 45 (Arrest Report) with ECF No. 24 at 46.

4    Petitioner relies on this time discrepancy as the basis for the asserted Miranda violation.

5        Under Miranda v. Arizona, 384 U.S. 436, 444 (1966), a person in custody subject to

6    interrogation "must be warned that he has a right to remain silent, that any statement he does

7    make may be used as evidence against him, and that he has the right to the presence of an

8    attorney, either retained or appointed." A custodial interrogation is defined as "questioning

9    initiated by law enforcement officers after a person has been taken into custody or otherwise

10   deprived of his freedom of action in any significant way." Id. The prosecution bears the burden

11   of demonstrating that the warnings were given and that a waiver of these rights was obtained by

12   the police before the suspect's statements in response to questioning can be admitted as evidence

13   at trial. Miranda, 384 U.S. at 479; see also Oregon v. Elstad, 470 U.S. 298, 306 (1985) (referring

14   to the "Miranda exclusionary rule"). The requirements of Miranda are "clearly established"

15   federal law for purposes of federal habeas review under 28 U.S.C. § 2254(d). See Juan H. v.

16   Allen, 408 F.3d 1262, 1271 (9th Cir. 2005).

17       Petitioner presented this claim in his state habeas petition to the California Supreme

18   Court. Based on the silent denial of his habeas petition, there is no reasoned state court decision

19   concerning this claim for relief. In the absence of a reasoned state court opinion, this court

20   conducts an independent review of the record to determine what rationale could support the state

21   court judgment and whether such rationale was an objectively reasonable application of federal

22   law. See Harrington, 562 U.S. at 102; Cullen, 563 U.S. at 188; Delgado v. Lewis, 223 F.3d 976,

23   982 (9th Cir. 2000).

24       The record of the motion in limine hearing in the trial court indicates that petitioner's

25   recorded statements while detained in the police cruiser on the morning of June 6, 2013 were not

26   made in response to questioning by police. As the trial court found: "These are custodial but no

27   interrogation statements so it's not a Miranda situation. These are just comments, as I understand

28   it, that the defendant made sua sponte while sitting in the rear seat of the patrol car." ECF No.

16

1    50-8 at 48.  The trial court accordingly admitted these inculpatory statements because they were

2    not made in response to police questioning.  Miranda warnings are not required when there is no

3    police questioning.  See Elstad, 470 U.S. 298, 317 (1985) ("When police ask questions of a

4    suspect in custody without administering the required warnings, Miranda dictates that the answers

5    received be presumed compelled and that they be excluded from evidence at trial in the State's

6    case in chief."); Berkemer v. McCarty, 468 U.S. 420, 429 (1984) ("[I]f the police take a suspect

7    into custody and then ask him questions without informing him of the rights enumerated above,

8    his responses cannot be introduced into evidence to establish his guilt.") (footnote and citations

9    omitted).  Thus, the California Supreme Court could have reasonably rejected petitioner's

10   Miranda claim based on the absence of questioning by police.  Claim nine should be denied.

11                    **D.  Ineffective Assistance of Counsel (Claims Three and Seven)**

12            Petitioner challenges several instances of alleged ineffectiveness by both his trial and

13   appellate attorneys.  The two prong Strickland standard governs ineffective assistance of counsel

14   claims.  Strickland v. Washington, 466 U.S. 668 (1984).  It requires petitioner to establish (1) that

15   counsel's representation fell below an objective standard of reasonableness; and, (2) that

16   counsel's deficient performance prejudiced the defense.  Strickland, 466 U.S. at 692, 694.  "The

17   question is whether an attorney's representation amounted to deficient performance under

18   'prevailing professional norms,' not whether it deviated from best practices or most common

19   custom."  Harrington, 562 U.S. at 105 (citing Strickland, 466 U.S. at 690).  Prejudice exists where

20   "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

21   proceeding would have been different.  A reasonable probability is a probability sufficient to

22   undermine confidence in the outcome."  Strickland, 466 U.S. at 693.  "That requires a

23   'substantial,' not just 'conceivable,' likelihood of a different result."  Cullen, 563 U.S. at 189

24   (quoting Harrington, 562 U.S. 86, 111-12 (2011)).

25            In reviewing a Strickland claim under AEDPA, the federal court must be "doubly"

26   deferential in determining whether counsel's challenged conduct was deficient.  Harrington, 562

27   U.S. at 105.  "When § 2254(d) applies, the question is not whether counsel's actions were

28   reasonable.  The question is whether there is any reasonable argument that counsel satisfied

                                                                17

1    Strickland's deferential standard."  Id.

2         In claim three, petitioner asserts that trial counsel was deficient for failing to request a jury

3    instruction on provocation that would have negated his conviction for first degree premeditated

4    murder.  ECF No. 24 at 8.  This claim was denied in a reasoned decision by the California Court

5    of Appeal on direct review.  ECF No. 10-2 at 18-22.[4]  The state court applied the Strickland

6    standard governing IAC claims and first determined that counsel's performance was not deficient

7    because there was insufficient evidence of provocation to justify the jury instruction.  ECF No.

8    10-2 at 19.  "There is no evidence [petitioner] formed the intent to kill and acted on that intent

9    immediately after the incident at McDonald's or that provocation affected him in any way."  Id.

10   Additionally, the state court denied relief by finding no prejudice resulting from counsel's

11   challenged conduct after reviewing the jury instructions that were given as a whole.  Id. at 20-22.

12   "The jury was sufficiently instructed on state of mind, second degree murder, and provocation as

13   an element of voluntary manslaughter such that any error in not instructing on provocation as

14   negating premeditation and deliberation was cured."  Id. at 20.  The California Court of Appeal

15   emphasized that the jury rejected petitioner's defense at trial and any additional pinpoint

16   instruction on provocation would not have resulted in a different verdict.  Id. at 22-23.  Having

17   reviewed the state court record, this court concludes that the denial of relief on this claim was

18   neither contrary to nor an unreasonable application of the Strickland standard governing IAC

19   claims.  See 28 U.S.C. § 2254(d).  Claim three should therefore be denied.

20        Petitioner's remaining IAC claims were denied by the California Supreme Court in an

21   unreasoned opinion which constitutes a denial on the merits under the AEDPA.  See ECF No. 32-

22   2; Harrington, 562 U.S. at 99-100.  Having independently reviewed the record, the undersigned

23   concludes that the remaining IAC claims could have been rejected by the California Supreme

---

24

25   [4]  The California Court of Appeal analyzed this claim as a failure to request CALCRIM No. 522.
     ECF No. 10-2 at 18 n. 8.  This instruction provides that "provocation may reduce a murder from
26   first degree to second degree [and may reduce a murder to manslaughter].  The weight and
     significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the
27   defendant committed murder but was provoked, consider the provocation in deciding whether the
     crime was first or second degree murder.  [Also, consider the provocation in deciding whether the
28   defendant committed murder or manslaughter.]"  Id.

1    Court based on lack of a prima facie case demonstrating any prejudice resulting from counsel's

2    challenged conduct.  See Cullen, 563 U.S. at 188, n. 12 (finding California court's summary

3    denial represents determination that petitioner failed to state a prima facie case).  Petitioner makes

4    much of his diagnosis of PTSD, but the evidence he presented to the state court does not establish

5    that his trial counsel was aware of his PTSD and also does not establish that he was taking any

6    medication for such a diagnosis at the time of the offense in 2013.  See ECF No. 24 at 32-33

7    (evidence from 2016 and 2019) & 36 (statement that "neither attorney Brace nor PI Butrym

8    recalled having knowledge of Leonard's PTSD").

9        Additionally, petitioner has not shown that Ms. Silva's unelicited testimony and the

10    purported testimony of the McDonald's manager were substantially likely to have changed the

11    jury's verdict.  See ECF No. 24 at 16.  The record is relatively thin as to what this alternative

12    testimony would have been.  A "Memorandum" from Tara K. Hoveland, an attorney whose role

13    in the case is not clearly identified, states only that it "appeared" to a private investigator hired by

14    petitioner's trial counsel, who interviewed "witnesses at McDonald's" that petitioner "tried t[o]

15    take justice into his own hands."  Without information about precisely what testimony should

16    have been elicited, there is no meaningful showing of prejudice.  Therefore, these IAC claims

17    could reasonably have been rejected by the California Supreme Court based on lack of prejudice.

18    See Cullen, 563 U.S. at 190 (emphasizing that petitioner "must demonstrate that it was

19    necessarily unreasonable for the California Supreme Court to conclude: (1) that he had not

20    overcome the strong presumption of competence; and (2) that he had failed to undermine

21    confidence in the jury's sentence....").

22        Likewise, the IAC claim related to the asserted Miranda violation also fails due to lack of

23    prejudice.  For the reasons explained in section IV(C) supra, any objection based on Miranda to

24    petitioner's statements would have been overruled because petitioner's statements were not made

25    in response to questioning by police.  For all these reasons, petitioner's IAC claims asserted in

26    claim seven should be denied.

27            **E.  Sufficiency Challenges to the Evidence (Claims Four Through Six)**

28        Petitioner challenges the sufficiency of the evidence supporting his conviction on the

1  grounds that there was no evidence of planning or premeditation, the physical evidence was

2  inconsistent with the victim's testimony, and the evidence of provocation warrants reducing his

3  conviction to voluntary manslaughter.  ECF No. 24 at 10-14.

4      Due process requires that each essential element of a criminal offense be proven beyond a

5  reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of

6  evidence to support a conviction, the question is "whether, viewing the evidence in the light most

7  favorable to the prosecution, any rational trier of fact could have found the essential elements of

8  the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, (1974).  If the

9  evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact

10  resolved any such conflicts in favor of the prosecution," and the court must "defer to that

11  resolution."  Id. at 326.

12      The California Court of Appeal rejected petitioner's sufficiency challenge on direct appeal

13  finding that petitioner's planning, motive, and manner of killing Mr. Harrison and attempted

14  killing of Mr. Oliphant supported his conviction for first degree murder and attempted

15  premeditated murder.  ECF No. 10-2 at 23-25.  Notably, petitioner "did not get out of the truck to

16  help [Mr. Harrison] or call for aid.  Instead, he reversed the truck, turned around, and aimed it at

17  Oliphant….  When [petitioner] got out of his truck, he still did not help Harrison or call for aid.

18  Instead, he kicked him in the head and torso several times with his steel-toed boots while yelling

19  racial epithets at him.  The jury could reason from these facts 'the manner of killing was so

20  particular and exacting that the defendant must have intentionally killed according to a

21  preconceived design to take his victim's life in a particular way.'"  ECF No. 10-2 at 25 (internal

22  quotations and citation omitted).

23      The state court's denial of petitioner's sufficiency challenge was not contrary to nor an

24  unreasonable application of the Jackson standard of review.  This trial was not much of a

25  credibility contest due to the videotape of the events in the McDonald's parking lot, the two

26  neutral eyewitnesses in the Clutch Mart parking lot, and the inculpatory statements made by

27  petitioner while waiting in the police cruiser.  To claim the killing of Mr. Harrison was accidental

28  (as petitioner claims) in light of all this evidence was inherently incredible and the jury so

20

1   concluded.  Ultimately, petitioner's sufficiency challenge boils down to a challenge to the jury's

2   credibility determinations as to petitioner's mental state.  However, a jury's credibility assessment

3   is afforded great weight and is not generally subject to review in federal habeas corpus

4   proceedings.  See Schlup v. Delo, 513 U.S. 298, 330 1995 (emphasizing that "the assessment of

5   the credibility of witnesses is generally beyond the scope of review" under Jackson).  Here,

6   applying the deferential Jackson standard of review, a rational jury could have found sufficient

7   evidence to convict petitioner of first degree murder and attempted premeditated murder.  See

8   Boyer v. Belleque, 659 F.3d 957, 964-65 (9th Cir. 2011) (emphasizing that in a federal habeas

9   action, the review of a sufficiency of the evidence challenge is doubly deferential).  Therefore, the

10  state court's denial of this claim was not an unreasonable determination of the facts nor contrary

11  to federal law.  28 U.S.C. § 2254(d).  Claims four through six should be denied.

### F.  PTSD At Trial

13          The court has already rejected petitioner's related IAC claim for failing to investigate and

14  produce evidence of petitioner's PTSD.  See supra at IV(D).  In Claim Eight, Petitioner appears to

15  allege he was incompetent at trial because he "was highly medicated suffered from severe

16  (PTSD) mental illness."  ECF No. 24 at 17.  The record is void of any evidence establishing that

17  petitioner was taking any medication for PTSD that would have affected his mental state at trial

18  or that his mental state was otherwise so altered by PTSD at the time of trial such that he was not

19  competent.  Absent such evidence, Claim Eight should be denied.

### G.  New Claims Raised in Traverse

21          It appears to the court that none of the new claims are properly exhausted.  See 28 U.S.C.

22  § 2254(b)(1)(A) (requiring exhaustion of state court remedies before federal habeas relief can be

23  granted).  Petitioner does not indicate any efforts he has taken to exhaust these claims in state

24  court or why he failed to raise them previously.  Absent exhaustion, this court is precluded from

25  granting petitioner relief on any of the new claims that he raises for the first time in his traverse.[5]

26

27  _____

[5]  Moreover, this court is precluded from reviewing any evidence that has not been presented in
28  state court.  See Cullen, 563 U.S. 170.  Therefore, the exhibits attached to petitioner's traverse do
    not provide any basis upon which this court can grant relief.

1    Therefore, they should be denied as unexhausted.

2              **V.      Request for Evidentiary Hearing**

3              By order dated March 8, 2023, the previously assigned magistrate judge denied

4    petitioner's request for an evidentiary hearing as premature at that procedural stage in the

5    litigation.  ECF No. 58.  The court indicated that it would reconsider petitioner's request when it

6    reviewed the merits of the amended § 2254 application.  To this end, the undersigned finds that,

7    after having reviewed the state court record, petitioner is not entitled to an evidentiary hearing on

8    any of his claims for relief.  See 28 U.S.C. § 2254(e)(2).

9              **VI.     Plain Language Summary for Party Proceeding Without a Lawyer**

10             The following information is meant to explain this order in plain English and is not

11   intended as legal advice.

12             The court has reviewed your second amended habeas petition and the trial court record in

13   your case.  The undersigned is recommending that your amended habeas petition be denied on the

14   merits.  If you disagree with this result, you have 21 days to explain why it is not correct.  Label

15   your explanation "Objections to Magistrate Judge's Findings and Recommendations."  The

16   district court judge assigned to your case will then review the entire record and make the final

17   decision.

18             Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

19   habeas corpus be denied.

20             These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty one days

22   after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties.  Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations."  In his objections, petitioner

25   may address whether a certificate of appealability should issue in the event he files an appeal of

26   the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

27   court must issue or deny a certificate of appealability when it enters a final order adverse to the

28   applicant).  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant

1   has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

2   Any response to the objections shall be filed and served within fourteen days after service of the

3   objections.  The parties are advised that failure to file objections within the specified time may

4   waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

5   1991).

6   DATED: October 29, 2025

7

8

9   SEAN C. RIORDAN
    UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28